27 455
27ap431

In the Matter of the Final Accounting of HORACE GRAY and Others, Executors, etc., of RICHARD WARREN WESTON, Deceased.

*Executors — what time is allowed them within which to sell and dispose of the securities of the testator — when they are chargeable with moneys expended by them in paying off incumbrances on the testator's real estate — Allowances by the surrogate should not exceed $2,000 in all.*

Appeal from a decree of the surrogate of the county of New York.

The appeal was taken by the children of the testator, from the decree settling the accounts of the respondents, as executors.

The testator directed the executors to convert all the rest, residue and remainder of his estate, real and personal, except particular portions otherwise disposed of, into money, and to divide the net proceeds into three equal shares, one of which he gave and bequeathed to them in trust, with power to invest and keep the same invested in bonds or securities of the government of the United States, whereof the interest was payable in gold, or in such other securities as to them should seem most for the benefit of the fund designed to be created, and to apply the interest, income and profits of such share to the use of his son Warren, until he should attain the age of twenty-five years, and then the share was to be paid over and transferred absolutely to him. The other two shares were in like manner directed to be invested and held in trust, one for the benefit of each of his two daughters during her natural life. In case of the decease of the son under the age of twenty-five years, and upon the expiration of the life estates provided in trust for his daughters, the testator made other dispositions of this property, which are not required to be considered in the determination of this appeal, for they have no particular bearing upon, or appliation to, the points controverted by the parties. These points relate to certain acts of the executors in the administration of the estate, and to their failure to convert certain assets into money, under the power invested in them by the will.

The executors, were required, as soon as might be after the decease of the testator, to pay and discharge all his just debts.

He died on the seventh day of May, 1873, and they received their letters testamentary on the tenth of the following month.

The court at General Term said : " One of the principal subjects of controversy related to the shares of the St. Louis and Iron Mountain Railroad Company. These were 1,500 in number, 1,000 were found among the papers of the testator, and the other 500 were, as has already been stated, in the hands of his brokers, Ward, Campbell & Co. These shares in 1872, brought the sum of $102 each in the market, but at the time when the executors were appointed, their market value had fallen to the price of eighty dollars a share. Their value continued from that time until February, 1874, to be upon a descending scale.

" At that time the price advanced to the sum of sixty-seven dollars a share, but it soon fell off again, and in June, 1874, a year after the executors had received their appointment, the price had decreased to fifteen dollars a share. For this decrease, resulting in a large loss to the estate, it was claimed that the executors had become responsible, and that they should be charged to that extent by the surrogate. But he, as well as the auditor, took a different view of this subject, and rejected the claim. The position taken in its support was that the executors had been peremptorily required to convert these shares as a part of the residue and remainder of the estate into money, and having failed to do so they had become liable for the loss. But while this direction was given in the will, no time was specified in which the conversion of the shares into money was required to be made. That was accordingly committed, therefore, to a certain extent, to the discretion and good judgment of the executors. In exercising this authority they were necessarily required to consider the purposes and objects designed to be promoted by the conversion of the estate into money, and that was that it should be divided and invested as the testator directed it to be done for the benefit of his children. It was not intended that any exercise of discretion should indefinitely postpone the making of this change in the testator's property, but within the limits which it might be discreet and advisable to adopt, the testator left his personal representatives to follow their own judgment ; and for conforming to that in good faith, when the legal limits within which it could be exercised were not transcended, the executors would not

be liable. The testator selected for these officers three of his well known and trusty friends, whom he made legatees under his will. Two of them had been his business partners, and they all appear to have been in a peculiar degree the recipients of his confidence. The trusts reposed in them were confidential in their character, and required experience, intelligence, fidelity and good judgment for their proper performance ; and in carrying these shares the executors consulted others whose judgment and conclusions would be generally considered reliable and safe, and at the same time they themselves deemed it to be the only judicious and proper course that presented itself for their adoption. The circumstances under which they acted in this respect were also peculiar. The stock had fallen very considerably in value while it was held by the testator himself, and he did not, because of that circumstance, lose his confidence in it and consider it proper to sell it. On the contrary, a memorandum left by him with the 1,000 shares, indicated it to be his judgment that they might be safely held. After his decease this downward tendency in the price continued to characterize the market value of the stock, and on the 18th day of September, 1873, what has been often designated as the great financial panic, or business crisis, occurred, seriously depressing the saleable value of this species of securities. This was but a little more than three months after the executors had received their letters, and to this time surely there had been no such default on their part as, under the direction given to them, would render them responsible for the loss sustained on this stock. And after that it was the part of prudence to hold the stock for some anticipated improvement in its value. That improvement did come in February, but not to such an extent as to convince the executors that it was their duty to sell, or that the interests of the estate would be promoted by such a disposition of this property. They accordingly held it for further advances, but which, however, they failed to realize, for the market again fell off until in June the shares would sell for no more than fifteen dollars each. In this state of affairs it cannot be held that the executors acted improperly, for their conduct was such as prudent, cautious and intelligent business men would have deemed to have been proper if they had been managing their own personal affairs. And in the absence of any mandatory direction depriving the executors

of this authority, it was their duty to exercise it, and for such an exercise of it no liability on their part for this loss can legally be held to have arisen. The legal measure of the executors' liability under such circumstances has been the subject of frequent consideration in courts of justice, and where they have not delayed their action beyond the period which it has been deemed prudent to adopt as a proper measure of legal restriction, they have been exonerated from liability for losses which have resulted to the property committed to them, when it appeared, as it does in this case, that they carefully and attentively retained it because it could not be discreetly or judiciously sold. (*Thompson* v. *Brown*, 4 Johns. Ch., 628; *Buxton* v. *Buxton*, 1 Mylne & Cr., 80; *Davenport* v. *Stafford*, 14 Beav., 319; *Lansing* v. *Lansing*, 45 Barb., 183; *King* v. *Talbot*, 40 N. Y., 76; *Marsden* v. *Kent*, 5 Ch. Div. L. R., 598; *Pinckard* v. *Woods*, 8 Grat., 140; *McCabe* v. *Fowler*, 84 N. Y., 314.)

"But the exercise of this measure of discretion, and the protection afforded by it to the executors, must necessarily be limited in point of time, and in the English courts the proper boundary for it has been usually considered to be the period of one year (*Bate* v. *Hooper*, 5 De Gex, M. & G., 338; *Morgan* v. *Morgan*, 14 Beav., 72, 89, 91; *Hughes* v. *Empson*, 22 id., 181; *Wightwick* v. *Lord*, 6 H. L. 217, 226), where the House of Lords considered this to be the proper measure of such a restriction.

"This rule, however, has not been universally applied, for in the case of *Buxton* v. *Buxton* a delay of one year and seven months in making a sale was, under the circumstances, which were peculiar, considered not to render the executor chargeable for the loss occasioned by it. And in *Marsden* v. *Kent*, fifteen months was, for a like reason, not regarded as an inexcusable length of time. In this State, while an executor may render his account after one year from the date of his appointment, he is not obliged to do so before the expiration of eighteen months. After that time he may be compulsorily required to account, or proceedings for that purpose may be taken at his own instance. (3 R. S. [6th ed.], 99, § 63; Id., 101, § 73; Id., 103, § 85.)

"And it has been suggested that, under these provisions, executors are not chargeable for omitting to sell the estate committed to their hands for that purpose, when they do not delay the sale beyond

this designated time. But it is not necessary here to hold that such a legal consequence must result from the provisions of the statute, although they may be attended with a fair implication of that character. For even under the English rule, as it has generally been applied, limiting the time within which the executors may exercise their discretion over this subject to one year, they could not be rendered liable for the loss sustained by the depreciation of this stock. For while it did not in that time descend to its lowest figure, which was the sum of ten dollars a share, in September, 1874, it afterwards appreciated and advanced to the price of twenty-two dollars a share, and it continued to be of that value to the 25th of April, 1879, when the hearing before the auditor was closed. The estate, consequently, has lost nothing by the omission to sell the stock since June, 1874.   *   *   *

" The testator owned the undivided half of about sixty-five acres of land, with a residence upon it, situated at Dobbs Ferry. This was obtained by himself and Gray, one of the executors, from a creditor, at a nominal cost to the parties of about $225,000. It was subject to two mortgages, one for $4,000 and the other for $50,000. This undivided interest was not sold by the executors because of the difficulty, if not the impracticability, of finding a person who would purchase it. And the property was accordingly retained down to the year 1877, when the proceedings for the accounting were instituted. The estate may not have been subjected to loss by the mere omission to sell this property, for it did not certainly appear that any actual loss had been created by that circumstance. But during the time the executors held it, these mortgages were paid off, the smaller one in June, 1873, and the larger one in June, 1877, and the sum of $27,000 of the funds of this estate were used in making such payments. The debts secured by these mortgages was neither of them obligations existing against the testator. They were simply charges upon the property itself, the payment of which he does not appear in any form to have assumed. The executors, therefore, could not use any portion of his estate to extinguish these incumbrances under the clause in the will directing them to pay the testator's debts. What they had to do with this property, and all they had to do with it, was to convert it into money.

That was the clear and unambiguous direction contained in the will. No authority of any different character was given to them concerning this property, but their sole and simple duty, as the testator defined it, was to sell it. But that they wholly failed to do, and in addition to these payments made to relieve the estate from the mortgages, they paid in the way of expenses for taking care of, insuring and preserving, and for taxes upon it during the years 1873, '74, '75, '76, '77, the aggregate amount of $12,576.90. Of this amount, $5,133.93 was paid during the first eighteen months of their administration, and in which some sale of this place ought justly to have been made. And if that should be allowed to the executors for the cost of keeping the property during that period of time, it will still leave a loss to the estate of $7,442.97 for expenditures made on account of this property after the year of 1874. For this expenditure no authority, either express or implied, was given to them by the terms of the will. They were simply required to pay the testator's debts, and convert this, as a part of his residuary estate, into money. And as instruments of this nature are required to be construed, that did not authorize them either to pay off the mortgages upon this property with the funds of his estate, or to make these expenditures for the purpose of keeping it on hand. Good faith in these respects will not protect them, for what they did exceeded their authority. They had no right to appropriate the funds of the estate in that manner; and even though they may have done so, as they probably did, with the best intention, expecting in that manner to realize pecuniary advantages to the testator's estate, as the result proved to be an adverse one they are not entitled to protection. In *Albany Fire Ins. Co.* v. *Bay* (4 Comst., 9), it was held that a power to mortgage lands could not be implied from a power to sell. And applying a like principle and direction in this case, would exclude the power either to pay off these mortgages or to make these expenditures; for in doing so the executors were neither paying the debts of the testator nor converting his property into money. They transcended the authority given to them, and necessarily imposed the consequences of their expenditures upon themselves. (*Ackerman* v. *Emott*, 4 Barb., 626; *King* v. *Talbot*, 40 N. Y., 76; *Adair* v. *Brimmer*, 74 id.,

539; *Ringgold* v. *Ringgold*, 1 Harris & Gill, 11; *Heinemann* v. *Heard*, 50 N. Y., 27.) * * *

" The diversion of the funds of the estate to the payment of these mortgages, and defraying these expenses being unauthorized by the will, the amounts so diverted should be charged against the executors, subject to their right to reimburse themselves out of the proceeds arising from the sale of this undivided interest, to the extent of one-half of the actual incumbrances upon the property and the amounts paid out upon it in the years 1873 and 1874. That reimbursement should be allowed to them, for the reason that the mortgages were legal incumbrances upon the property when it passed into their hands, and the expenses paid by them in 1873 and 1874 were for the extinguishments of demands arising within the period of eighteen months, during which this property should have been sold after the letters testamentary had been issued to them.

" By the decree the surrogate allowed the counsel for the executors the sum of $7,500 as a reasonable counsel fee. And to the counsel representing the present appellants a like allowance of $1,000 was made. And to the guardian *ad litem* of the infant party an allowance of $2,000 was made. The propriety as well as the legal right to make these allowances is brought before this court by the appeal, for it has been taken without qualification from the entire decree. (*Noyes* v. *Children's Aid Society*, 70 N. Y., 481, 485.)

" They were made upon the authority of the Laws of 1870 (chap. 359, § 12), and while that was in terms repealed by the Laws of 1880 (chap. 245), the repeal was so far qualified as to render it inapplicable to this proceeding. (Laws 1880, ch. 245, pp. 373, 375, subd. 5.)

" But as this section of the act of 1870 has been construed, it has been considered as subordinate to the subsequent statutory provisions declaring that the allowances shall not exceed the sum of $2,000 to any party, or to all parties, if more than one, on either side. (Code of Proc., § 309.)

" This prohibition has been held applicable to the Surrogate's Court of the county of New York. (*Down* v. *McGourkey*, 15 Hun, 444; *Hurd* v. *Warren*, 16 id., 622.)

" And these authorities have been followed in the disposition of a more recent case not yet reported. And it would clearly involve an inconsistency of construction if this restraint should be required

462     PEOPLE ex rel. MOHR v. POLICE COMRS.

First Department, June Term, 1882.

to be observed by other courts, and not be operative upon that of the surrogate. But even if such an inconsistency should be sanctioned as a matter of discretion, the restraint prescribed by the legislature for the purposes of all other classes of litigation should be applied as equitable and proper to cases disposed of before the surrogate. These allowances in neither view can be sanctioned. They are without authority and entirely improper.

*George H. Foster*, for the appellants.

*Aaron Pennington Whitehead* and *John Duer*, for the respondents.

Opinion by Daniels, J.; Brady, J., concurred; Davis, P. J., taking no part.

Decree modified as directed in opinion, and affirmed as modified, without costs.